FILED

1   TOWNSEND AND TOWNSEND AND CREW LLP
    RICHARD L. GROSSMAN (State Bar No. 112841)
2   rlgrossman@townsend.com
    HOLLY GAUDREAU (State Bar No. 209114)
3   hgaudreau@townsend.com
    JEB B. OBLAK (State Bar No. 241384)
4   jboblak@townsend.com
    Two Embarcadero Center, Eighth Floor
5   San Francisco, California 94111
    Telephone: (415) 576-0200
6   Facsimile: (415) 576-0300

7   Attorneys for PLAINTIFF
    CYTEC ENGINEERED
8   MATERIALS INC.

2010 FEB 10  PM 1:49

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

9              UNITED STATES DISTRICT COURT

10        FOR THE CENTRAL DISTRICT OF CALIFORNIA

11                    WESTERN DIVISION

12   CYTEC ENGINEERED MATERIALS       Case No. SACV10-00163 DOC(RNBx)
     INC.,
13                                    COMPLAINT FOR ILLEGAL
                  Plaintiff,          RESTRAINT OF TRADE IN
14                                    VIOLATION OF § 1 OF THE
           v.                         SHERMAN ACT (15 U.S.C. §1)
15
     TOHO TENAX CO., LTD., TOHO
16   TENAX AMERICA, INC. and DOES I-  DEMAND FOR JURY TRIAL
     X,                               PURSUANT TO FED. R. CIV. P.
17                                    38 (b)
                  Defendants.
18

19

20        1.    Plaintiff Cytec Engineered Materials Inc. ("CYTEC" or "Plaintiff")

21   alleges:

22        2.    From early 1993 through 1999, the Defendants combined with others to fix

23   prices, allocate customers and markets and control production for carbon fiber on a

24   global basis.  This market division, output suppression and price fixing conduct

25   artificially increased, maintained, or stabilized, the price of carbon fiber sold to

26   Defendants' customers within California and throughout the United States and the

27   remainder of the world carbon fiber market from 1993 through 2001 (the "Relevant

28   Time Period").

COMPLAINT FOR VIOLATION OF § I OF THE SHERMAN ACT                              1
CASE NO. _____

3.     During the Relevant Time Period, each Defendant was a manufacturer and/or seller of carbon fiber purchased by Plaintiff and other carbon fiber customers for use in California and elsewhere in the United States and the remainder of the world.

4.     Carbon fibers are materials that have been treated at extremely high temperatures and contain a substantial percentage of carbon.  The product at issue in this case is PAN carbon fiber.  PAN carbon fiber is carbon fiber derived from polyacrylonitrile (PAN).

5.     Carbon fibers are differentiated by the number of filaments in a strand (the "tow"); for example, 3000 (3K), 6000 (6K), 12000 (12K), and 50000 (50K).  The 3K, 6K, and 12K carbon fibers (sometimes referred to as "low tow carbon fibers") are often used in high performance applications, such as aerospace.  The higher tows, such as 50K carbon fiber, are often used in less demanding applications, such as lower cost recreational products.  Carbon fibers are classified according to their stiffness or modulus of elasticity, measured in units of force per area (million pounds per square inch or "MSI").  Carbon fibers are classified as standard modulus (28-38 MSI), intermediate modulus (40-50 MSI), high modulus (50-70 MSI) or ultra high modulus (70-140 MSI).  Carbon fibers are also classified in accordance with tensile strength, e.g., T-700 fiber has a tensile strength of 700 KSI.

6.     Carbon fibers are not an end product.  Depending on the application requirements, carbon fibers are reinforced by embedding them with various types of resins, among other things.  The resulting material, called prepreg, is reinforced carbon fiber that has been impregnated with resins.  PAN carbon fiber prepreg is PAN carbon fiber pre-impregnated with resins prior to its use in manufacturing products.

7.     The mechanical properties of carbon fiber composites, such as strength and stiffness, are comparable to metal, but have certain properties which make them uniquely suitable for certain applications.  The primary advantage of carbon fiber composites is their light weight.  Compared with other construction materials, such as steel and aluminum, carbon fiber composites exhibit excellent strength, durability,

1  fatigue resistance, thermal and electric conductivity, radar transparency and stiffness,

2  while being very lightweight.

3       8.    These composites are used in recreational and industrial applications as

4  well as items such as artificial limbs and in the aerospace and aircraft industries to

5  produce various parts of space vehicles and aircraft.

6       9.    PAN carbon fiber and PAN carbon fiber prepreg are referred to in this

7  Complaint as simply "carbon fiber" and "prepreg," respectively.

8  **I.    PLAINTIFF**

9       10.    Cytec Engineered Materials Inc. ("CYTEC") is a wholly owned subsidiary

10  of Cytec Industries Inc., incorporated in Delaware, with headquarters in Tempe,

11  Arizona and manufacturing facilities in California and elsewhere in the United States.

12  In 1997, CYTEC purchased Fiberite Inc. a/k/a ICI Fiberite (hereafter, "Fiberite").

13  During the Relevant Time Period, both CYTEC and Fiberite purchased carbon fiber

14  from Defendants and other carbon fiber suppliers for use in the manufacture of prepreg

15  at their facilities within the United States, including their prepreg manufacturing

16  facilities in California.

17  **II.   DEFENDANTS**

18      **Toho Group**

19       11.    Defendant Toho Tenax Co., Ltd. (formerly known as Toho Rayon Co.

20  Ltd.) ("TOHO") is a corporation with a principal office and place of business in Tokyo,

21  Japan.  TOHO is now a subsidiary of Teijin Limited.  During the Relevant Time Period,

22  TOHO had carbon fiber manufacturing facilities in Mishima, Japan, and also produced

23  PAN precursor and prepreg.

24       12.    Defendant Toho Tenax America, Inc. (formerly known as Toho Carbon

25  Fibers, Inc.) ("TOHO CARBON FIBERS") is incorporated in North Carolina and is a

26  wholly owned subsidiary of TOHO, with its current headquarters in Rockwood,

27  Tennessee.  During the Relevant Time Period, TOHO CARBON FIBERS served as the

28  marketing organization for TOHO in the United States, with its headquarters in Menlo

1   Park, California.

2   　　　13.　　Each of the DOE defendants I-X is either a principal of, or directed by, one

3   of the Defendants, or is an agent of Defendants acting with regard to the matters herein

4   complained of in the course and scope of such agency, has conspired with one or more

5   of the Defendants and/or Co-conspirators to engage in the alleged acts, or is in some

6   way responsible for the acts of the Defendants alleged herein.　The precise names and

7   capacities of the DOE defendants and the precise role they played in the events alleged

8   herein are known to the Defendants but not currently to the Plaintiff, who therefore sues

9   them herein by fictitious names.　Plaintiff will amend this Complaint to reflect the true

10   names and capacities of the DOE defendants, and the precise nature of their relationship

11   to the Defendants when ascertained.

12   **III.　OTHER CARBON FIBER SUPPLIERS WHO COMBINED WITH**
   **DEFENDANTS**

13

14   　　　14.　　Each of the Defendants combined with various other persons, firms and

15   corporations not named as defendants in this Complaint, who participated as co-

16   conspirators with the Defendants in the conduct described in this Complaint ("Co-

17   conspirators").　Each of the Defendants and their Co-conspirators performed acts and

18   made statements in furtherance of the illegal conspiracy and combinations in the carbon

19   fiber market.

20   　　　**A.　　Toray Group**

21   　　　15.　　Co-conspirator Toray Industries, Inc. ("TORAY") is a corporation with a

22   principal office and place of business in Tokyo, Japan.　During the Relevant Time

23   Period, TORAY had PAN carbon fiber manufacturing facilities in Ehime, Japan.　Its

24   subsidiary, Co-conspirator Toray Carbon Fibers America, Inc. ("TORAY CFA"), had

25   carbon fiber manufacturing facilities in Decatur, Alabama.　TORAY's joint venture

26   Société des Fibres de Carbone S.A. ("SOFICAR") had PAN carbon fiber

27   manufacturing facilities in Abidos, France.　TORAY also produces PAN precursor and

28   prepreg.　During the Relevant Time Period, TORAY was the world's largest

   manufacturer of carbon fiber.

**B.    Mitsubishi Group**

16.    Co-conspirator Mitsubishi Rayon Co., Ltd. ("MITSUBISHI") is a corporation with a principal office and place of business in Tokyo, Japan.  During the Relevant Time Period, MITSUBISHI was a manufacturer of carbon fiber, PAN precursor, and prepreg.

17.    Co-conspirator Grafil, Inc. ("GRAFIL") is incorporated in California and has a principal office and place of business in Sacramento, California.  During the Relevant Time Period, GRAFIL was a producer of carbon fiber at its Sacramento facility and was a wholly owned subsidiary of MITSUBISHI.

**C.    Hercules**

18.    Co-conspirator Hercules, Incorporated ("HERCULES") is incorporated in Delaware and has its principal place of business in Wilmington, Delaware.  Beginning prior to 1993 and continuing to June 1996, HERCULES owned and operated carbon fiber manufacturing facilities in Magna, Utah, prepreg facilities in Spain and Utah, and PAN production facilities in Decatur, Alabama.  HERCULES sold these carbon fiber, PAN and prepreg manufacturing facilities to Hexcel Corporation in 1996.

**D.    Hexcel**

19.    Co-conspirator Hexcel Corporation ("HEXCEL") is incorporated in Delaware and has its headquarters in Stamford, Connecticut.  Prior to June 1996, HEXCEL produced prepreg and composite structures made from prepreg.  In June 1996, HEXCEL acquired HERCULES' carbon fiber manufacturing facilities and joined the illegal conspiracy described herein.  HEXCEL had its principal carbon fiber manufacturing operations in Magna, Utah, and PAN production facilities in Decatur, Alabama.

**E.    BP Amoco**

20.    Co-conspirator BP Amoco Polymers, Inc. ("BP AMOCO") was incorporated in Delaware and had a principal office and place of business in Alpharetta,

Georgia.  BP AMOCO was previously known as Amoco Performance Products, Inc. ("APPI"), then changed its name to Amoco Polymers, Inc. in and around 1995 and merged with BP Corporation in and around 1998 to become BP Amoco Polymers, Inc. BP AMOCO continued to operate under the name BP Amoco Polymers, Inc. through the end of the Relevant Time Period.  Plaintiff alleges, on information and belief, that BP Amoco Polymers, Inc. became Innovene Polymers, Inc. in 2005 and is currently known as Ineos Polymers, Inc.  During the Relevant Time Period, BP AMOCO produced carbon fiber at its facilities in Greenville and Rock Hill, South Carolina.  BP AMOCO produced some of its carbon fiber under licensing arrangements with TORAY.  BP AMOCO also produced PAN precursor through a joint venture with Sumitomo Industries.  During the time period beginning prior to 1993 and continuing through 1999, or later, BP AMOCO also was the exclusive reseller of TORAY's T-300 1K, 3K and 6K carbon fiber in the United States, pursuant to a verbal "gentlemen's agreement."  BP AMOCO also was a non-exclusive reseller of TORAY 12K carbon fiber.  During that same time period, BP AMOCO also produced and sold its own 1K, 3K, 6K, and 12K carbon fiber in the United States.

21.  During the Relevant Time Period, each Defendant and Co-conspirator was the agent of the other and in performing the wrongful acts alleged herein, was acting within the course of such agency.  Each Defendant ratified and/or authorized the wrongful acts of the other Defendant and Co-conspirators and engaged in a common course of conduct.

22.  The relevant product market in this action is the market for the sale of carbon fiber.  Cytec's claims for relief in this action arise only out of the illegal conduct of Defendants and their Co-conspirators in the market for carbon fiber before it was infused with resins to make prepreg materials.  Cytec does not assert that any illegal agreements were reached concerning prepreg among competitors in the prepreg market and this action does not include any claims for relief arising out of the conduct of Defendants or their Co-conspirators in the prepreg market.

## IV.   JURISDICTION AND VENUE

23.    Plaintiff's claim is brought under Section 4 of the Clayton Act, 15 U.S.C. § 12 *et seq.* to recover treble damages and costs of suit, including reasonable attorneys' fees, against the Defendants for the injuries sustained by Plaintiff as a result of the Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 *et seq.* Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1337, and Section 4 of the Clayton Act, 15 U.S.C. § 15 (a).

24.    Venue is proper in this Court pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. § 1391 (b) and (c).

25.    Many of the unlawful acts performed in furtherance of the combination and conspiracy alleged in this Complaint occurred within this district and elsewhere in California and the United States.  The unlawful conduct of the Defendants and their Co-conspirators described herein caused injury to Plaintiff in this district and to other consumers of carbon fiber in California.  Each Defendant transacts business, maintains an office, resides or is found, or has an agent in this district.  The interstate trade and commerce described herein has been carried out in part within this district.

## V.    THE PARTIES' STATUTE OF LIMITATIONS TOLLING AGREEMENT

26.    In January 2003, CYTEC, the Defendants and their Co-conspirators entered into a Modification to Joint Defense Agreement ("Agreement") whereby each agreed to forbear from filing any antitrust or unfair competition claim against the other related to the purchase or sale of carbon fiber in the United States or elsewhere.  The Agreement provides that the statute of limitations on such claims does not begin to run until thirty days after a party gives notice of termination of the Agreement.  On January 11, 2010, CYTEC provided notice that it was terminating the Agreement, effective February 10, 2010, solely as to TOHO and TOHO CARBON FIBERS.

## VI.   FRAUDULENT CONCEALMENT

27.    During the Relevant Time Period, the Defendants and their Co-conspirators affirmatively and fraudulently concealed their unlawful combination and

1  conspiracy from Plaintiff.

2      28.    Throughout the 1990s, various representatives of CYTEC (and

3  representatives of Fiberite before it was acquired by CYTEC) met frequently with their

4  carbon fiber suppliers to discuss the carbon fiber prices the suppliers intended to

5  charge.

6      29.    When they communicated with CYTEC (and its predecessor, Fiberite), the

7  Defendants and their Co-conspirators gave a variety of misleading justifications for

8  their carbon fiber pricing but on no occasion did they reveal the fact that carbon fiber

9  prices were substantially affected by their price fixing, concerted output suppression

10  and allocation of carbon fiber customers and markets.

11      30.    For example, in June 1995, TOHO CARBON FIBERS told Fiberite

12  management that carbon fiber supply will be tight and therefore a substantial price

13  increase would be justified.  Indeed, a year earlier, MITSUBISHI and TORAY

14  conferred with TOHO CARBON FIBERS about their scheme to increase carbon fiber

15  prices by implanting the worry there would be a shortfall of raw materials.

16      31.    In May of 1996, Yoshida of TOHO wrote to Drincola of CYTEC and

17  blamed TOHO's carbon fiber price increases on continuing unfavorable cost pressures,

18  cost and unavailability of acrylonitrile raw materials, expedited shipping requirements,

19  inefficient manufacturing and delivery procedures, carbon fiber shortages and overseas

20  carbon fiber pricing when, in fact, TOHO's prices were primarily driven by its illegal

21  conduct.

22      32.    In April 1995, Lemire of TOHO CARBON FIBERS represented to its

23  customer SCI that TOHO CARBON FIBERS' carbon fiber pricing was driven by

24  increased labor and raw material costs, as well as the U.S. dollar/Japanese yen

25  exchange rate, thereby putting more pressure on TOHO CARBON FIBERS to increase

26  carbon fiber prices.  Similar misrepresentations were also made to CYTEC and its

27  predecessor, Fiberite.

28      33.    On May 30, 2002, TOHO and its subsidiary, TOHO CARBON FIBERS,

1   pled guilty to obstruction of justice for attempting to conceal from the grand jury

2   documents concerning pricing actions by, and contacts and communications concerning

3   price increases, price floors and the exchange of price information among and between

4   executives of companies that compete in the manufacture, distribution and sale of

5   carbon fiber.

6          34.    Throughout the 1990s, Mike Molyneux of CYTEC generally met several

7   times per year with Burns of HERCULES to discuss the prices HERCULES charged

8   CYTEC for carbon fiber.  Often, in these meetings, Molyneux was joined by lower

9   level CYTEC pricing managers and Burns was joined by Mettenet, HERCULES'

10  Manager of Carbon Fiber Marketing & Sales.  During each of these meetings,

11  Molyneux pressed hard for pricing concessions from HERCULES but Burns resisted all

12  requested price reductions and assured Molyneux that HERCULES' carbon fiber

13  pricing was driven by competitive market forces such as supply, demand, costs and the

14  need to provide consistent pricing to all HERCULES customers and, therefore,

15  HERCULES' pricing could not be altered.  On at least one occasion, Molyneux also

16  pressed for pricing concessions from Burns' superiors but received a similar response.

17         35.    Throughout the 1990s, Molyneux of CYTEC generally also met several

18  times per year with D.J. DeLong of BP AMOCO to discuss the prices BP AMOCO

19  charged CYTEC for carbon fiber.  Often, in those meetings Molyneux was joined by

20  lower level CYTEC pricing managers.  During each of these meetings, Molyneux

21  pressed hard for pricing concessions from BP AMOCO but DeLong resisted all

22  requested price reductions and assured Molyneux that BP AMOCO's carbon fiber

23  pricing was driven by competitive market forces such as supply, demand, costs and the

24  need to provide consistent pricing to all BP AMOCO customers and, therefore BP

25  AMOCO's pricing could not be altered.  During May 1995, DeLong wrote several times

26  to inform CYTEC that BP AMOCO's carbon fiber price increases were due to the

27  rising cost of utilities, wages, precursor and other raw materials.  During 1996 and

28  1997, DeLong told Molyneux that due to an unanticipated shortage of supply in the

1   carbon fiber market BP AMOCO had no pricing flexibility and could not provide

2   CYTEC with most of the volume discounts that CYTEC had previously obtained.

3        36.    Frequently lower level CYTEC employees discussed pricing with their

4   counterparts at CYTEC's carbon fiber suppliers without the direct participation of

5   Molyneux.  For example, in October 1995, Steve Speak of CYTEC met with his

6   counterparts at BP AMOCO.  During the meeting, the BP AMOCO representatives told

7   Speak that BP AMOCO would be charging significantly higher prices for carbon fiber

8   to their U.S. customers because of inflationary pressures and higher prices for carbon

9   fiber in Europe.  In August 1995, Gutzmer of BP AMOCO wrote Fowler (at CYTEC's

10  predecessor, Fiberite) to explain that the dollars/yen relationship had caused significant

11  upward price pressure on TORAY carbon fiber that was resold to United States

12  customers by BP AMOCO.

13       37.    The Defendants and their Co-conspirators engaged in a successful, illegal

14  price fixing conspiracy, output suppression and market/customer allocation scheme that

15  was unlikely to succeed if it was revealed to their customers and, therefore, by its

16  nature was inherently self-concealing.

17       38.    The Defendants and their co-conspirators also sought to hide their illegal

18  activities by holding clandestine meetings with competitors, carefully avoiding the

19  creation of written accounts of their pricing discussions, or instructing recipients of

20  those documents to "destroy after reading."

21       39.    The affirmative actions of the Defendants and their Co-conspirators were

22  wrongfully concealed and carried out in a manner that precluded detection.  Plaintiff

23  did not and could not have uncovered the violations alleged herein at any earlier date.

24  Defendants and their Co-conspirators falsely attributed their price increases to increases

25  in the cost of materials, shortage of supply and other competitive market factors when,

26  in fact, price increases were the result of their illegal combination and conspiracy to fix

27  prices, suppress output and allocate customers and markets.

28       40.    Plaintiff had no knowledge that the Defendants and their Co-conspirators

were violating the antitrust laws as alleged in this Complaint until sometime in 1999 after the *Thomas & Thomas Rodmakers, Inc., et al. v. Newport Adhesives and Composites, Inc.*, et al. class action proceeding was filed on July 27, 1999.  Plaintiff could not have discovered any of the violations earlier by the exercise of due diligence because of the fraudulent and affirmative concealment of the combination and conspiracy by the Defendants and their Co-conspirators.

41.    By virtue of the fraudulent concealment by the Defendants and their Co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiff has as a result of the unlawful combination and conspiracy alleged in this Complaint.

## VII.   DEFENDANTS' ONGOING CONSPIRACY TO FIX PRICES AND DIVIDE MARKETS

42.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, or control of the corporation's business or affairs.

43.    During the Relevant Time Period, each of the Defendants and the Co-conspirators manufactured carbon fiber and accounted for substantially all of the worldwide production of such carbon fiber.

44.    From 1993 through 1999, the Defendants and their Co-conspirators agreed to and did engage in a continuous course of action to establish "orderly marketing" in the carbon fiber industry by which they maintained, fixed, and/or increased the price of carbon fiber.  Defendants and their Co-conspirators also allocated markets and customers to each other, or deliberately restricted the supply and production of carbon fiber.  For example, the Defendants and their Co-conspirators agreed that certain carbon fiber suppliers would sell to companies that manufactured products made from carbon fiber for the United States Government, and other suppliers would not actively compete in this market, or would sell only certain specialty fibers to companies that

1    manufactured carbon fiber products for use by the United States Government.  All of

2    these actions resulted in the restriction of competition in the carbon fiber industry in

3    California and the remainder of the United States and the world, in violation of § 1 of

4    the Sherman Act, 15 U.S.C. § 1 (the "Price Fixing Scheme").

5    **VIII.  SPECIFIC ACTS AND EVIDENCE RELATING TO THE PRICE FIXING SCHEME**

6        **A.    How The Price Fixing Scheme Generally Worked**

7        45.    As a result of falling carbon fiber prices in 1992, at the beginning of 1993,

8    Defendants and their Co-conspirators began a series of meetings to set prices and divide

9    markets and customers in the United States, Europe, Japan and elsewhere in East Asia

10   in order to stabilize the market and increase prices.  The carbon fiber industry was

11   tightly controlled by a few companies.  TOHO and TOHO CARBON FIBERS

12   manufactured and sold carbon fiber in California and throughout the United States, and

13   manufactured and sold carbon fiber through Tenax in Europe ("TENAX").  BP

14   AMOCO and HERCULES manufactured carbon fiber and sold it in California and

15   throughout the United States.  MITSUBISHI manufactured carbon fiber and sold it in

16   California and throughout the United States via GRAFIL and/or directly from Japan.

17   MITSUBISHI sold carbon fiber in Europe through its subsidiary Grafil Europe.

18   MITSUBISHI manufactured prepreg and sold it in California and throughout the

19   United States via its subsidiary Newport Adhesives and Composites, Inc.

20   ("NEWPORT"), headquartered in Irvine, California.  TORAY manufactured carbon

21   fiber and sold it in the United States via its sales agent Kyokuto Boeki Kaisha Ltd.

22   ("KBK") to BP AMOCO, and its affiliates Toray Marketing Sales (America) Inc.

23   ("TOMAC") and TORAY CFA, and in Europe through SOFICAR.  TORAY also sold

24   prepreg in California and throughout the United States via its subsidiary Toray

25   Composites (America) Inc. ("TORAY COMPOSITES").  In addition, TOHO,

26   MITSUBISHI and TORAY manufactured and sold carbon fiber and prepreg in Japan

27   and sold carbon fiber and prepreg elsewhere in East Asia (e.g., Taiwan).  Together

28   these companies manufactured virtually all of the worldwide production of carbon fiber

1   during the Relevant Time Period.  On or about 1995, MITSUBISHI purchased the

2   carbon fiber manufacturing facilities of Asahi Kasei and removed them from

3   production.

4       46.    From at least 1993 until 2001, BP AMOCO manufactured PAN carbon

5   fiber at its Greenville, South Carolina facility, including 3K, 6K, and 12K, under a

6   technology licensing agreement with TORAY, using TORAY technology (hot roll

7   oxidation) for the manufacturing process.  As part of the technology licensing

8   agreement, BP AMOCO paid royalties to TORAY for certain types of BP AMOCO

9   fiber produced at Greenville.

10      47.    In November 1994, BP AMOCO purchased BASF's carbon fiber

11  production facilities at Rockhill, South Carolina.  These facilities were not subject to a

12  TORAY licensing agreement.

13      48.    From at least 1993 through about 1999, or later, in addition to the

14  technology licensing agreement, BP AMOCO and TORAY had a verbal agreement

15  whereby BP AMOCO would act as the exclusive reseller of TORAY's 1K, 3K and 6K

16  carbon fiber in the United States.  BP AMOCO was also a nonexclusive reseller of

17  TORAY's T-300 12K and other 12K products.  BP AMOCO received a percentage of

18  the sales price for reselling the TORAY manufactured carbon fiber.  The parties

19  understood that these arrangements could be terminated at will.

20      49.    While BP AMOCO had the exclusive resale agreement with TORAY to

21  import and resell TORAY's T-300 1K, 3K, and 6K, in the United States, and the

22  nonexclusive right to sell TORAY 12K carbon fiber in the United States, BP AMOCO

23  ostensibly competed with TORAY in the United States for sales of BP AMOCO's own

24  1K, 3K, 6K, and 12K carbon fiber (i.e., produced at BP AMOCO's Greenville or

25  Rockhill facility).

26      50.    Although BP AMOCO manufactured carbon fiber at Greenville using

27  technology licensed under the TORAY technology licensing agreement, this did not

28  permit BP AMOCO and TORAY lawfully to agree upon the sale price of the BP

1  AMOCO Greenville manufactured carbon fiber.

2       51.    From at least 1993 through 1999, BP AMOCO agreed with TORAY to

3  price the TORAY T-300 1K, 3K, 6K, 12K carbon fiber at the same price as its own 1K,

4  3K, 6K, and 12K carbon fiber, and did so.  Moreover, in exchange for the TORAY

5  distribution rights in the United States and its agreements to fix the prices in the United

6  States for carbon fiber at the same level as TORAY's carbon fiber, BP AMOCO agreed

7  that it would not sell carbon fiber in Japan or Europe.  That agreement constituted

8  illegal price fixing and market allocation.

9       52.    BP AMOCO executive Beasley was present at many of the TORAY/BP

10  AMOCO meetings, and told others of the parties' coordinated carbon fiber pricing

11  practices.  When TORAY raised the price of the T-300 3K, 6K, and/or 12K that it sold

12  to BP AMOCO, BP AMOCO would raise the price of its own T-300 product to match

13  that of the new agreed upon BP AMOCO resale price for the TORAY product sold to

14  BP AMOCO.  TORAY and BP AMOCO knew that the others would coordinate and

15  match pricing.  BP AMOCO's price lists listed the same sale price for TORAY and BP

16  AMOCO carbon fibers.  Beasley was BP AMOCO's carbon fiber production manager.

17  DeLong was BP AMOCO's general manager (and Beasley's superior) who established

18  the pricing for BP AMOCO's carbon fiber.

19       53.    Thus, the price of all T-300 1K, 3K, 6K, and 12K sold into the United

20  States market between 1993 and 1999, or later, was price fixed, i.e., the T-300 1K, 3K,

21  6K, and 12K manufactured by TORAY and the T-300 1K, 3K, 6K, and 12K

22  manufactured by BP AMOCO.

23       54.    BP AMOCO also knew that at the time it was fixing prices with TORAY,

24  that TORAY was also fixing the price of carbon fiber and allocating customers and

25  markets for carbon fiber with the TOHO GROUP, the MITSUBISHI GROUP,

26  HERCULES and, after June 1996, HEXCEL.

27       55.    From at least 1993 through 1999, or later, TORAY and BP AMOCO

28  eliminated all competition between themselves in the sale of carbon fiber, including the

1   sale of carbon fiber in California and throughout the United States.  Throughout the

2   Relevant Time Period, BP AMOCO, TORAY, and KBK (TORAY's import agent to

3   BP AMOCO) described the BP AMOCO-TORAY relationship as a "gentlemen's

4   agreement" or a friendly relationship.

5         56.   From at least 1993 until his retirement (on or about 1998) TOHO

6   Managing Director, and subsequently, Chairman, Yamada regularly spoke with

7   representatives of TORAY and MITSUBISHI both at Carbon Fiber Association

8   meetings in Japan and at other places.  There were regular telephone calls and meetings

9   of these competitors that included pricing discussions.  The meetings would occur six to

10  seven times a year and were driven by a specific agenda.  The discussions would

11  include the whole range of carbon fiber products, especially the 3K, 6K and 12K

12  grades.  The pricing discussions included the United States market.

13        57.   At these meetings, Yamada would communicate TOHO pricing

14  information to TORAY and MITSUBISHI, and they would communicate price

15  assurances back to Yamada, who would in turn relay that information to Yoshida,

16  President of TOHO CARBON FIBERS.  Yoshida would then be directed to raise prices

17  as a result.  Yamada's pricing discussions with TORAY and MITSUBISHI were part of

18  the pattern set forth above and included the aerospace 3K and 6K markets.

19        58.   Yoshida acted at the direction of Yamada, who urged Yoshida to meet

20  with his competitors, allocate customers and engage in price fixing in the United States

21  just as TOHO was doing with its competitors (the TORAY and MITSUBISHI

22  GROUPS) in Europe and East Asia.

23        59.   Yamada rated Yoshida's performance on whether Yoshida was successful

24  in meeting with his competitors and fixing prices.  Yoshida told Yamada that sharing

25  price information with competitors could lead to United States antitrust liability but

26  Yoshida nevertheless engaged in such activity in order to satisfy Yamada.

27        **B.    Specific Evidence of the Price Fixing Scheme**

28        60.   On February 25, 1993, Tucci (HERCULES Vice President and General

1  Manager Composites Group), Burns (HERCULES Materials Business Director), and

2  Dobesh (HERCULES executive) met with Aoyama (MITSUBISHI General Manager

3  Carbon Fiber and ACM Division), Sasawaki (MITSUBISHI Group General Manager

4  ACM and Products Division), Kataoka (MITSUBISHI Products Division, Senior

5  Managing Director), Matsuoka (MITSUBISHI Director Overseas Planning-ACM and

6  Products Division), and Nogami (GRAFIL President).  The parties discussed increasing

7  carbon fiber pricing.  This meeting apparently paved the way for Nogami's price fixing

8  meetings with HERCULES in the United States later in the year and thereafter.  That

9  same day, Tucci, Burns and Dobesh of HERCULES also met with TOHO executives

10  Yamada (Managing Director and Executive General Manager Carbon Fiber and

11  Specialties Division), Morita (Manager Carbon Fiber and Specialties Overseas Dept.),

12  Sekiguchi (Assistant Manager), Nagata (Supervisory Advisor) and Yoshida (President

13  of TOHO CARBON FIBERS).  The parties discussed the need for good cooperation in

14  the carbon fiber industry and their desire not to ruin the United States market via lower

15  prices.

16      61.    The following day, February 26, 1993, Tucci, Burns and Dobesh of

17  HERCULES met with TORAY's Director of the Advanced Composites Material

18  Division (Ichikawa), Manager of Overseas Marketing Carbon Fibers Department

19  (Maruyama), and Managing Director Ohzeki.  TORAY stated that it was receptive to

20  future meetings.

21      62.    HERCULES' agenda for these meetings described the carbon fiber

22  industry as suffering from a worldwide decline in the defense industry, a slowdown in

23  commercial aircraft build rates, poor financial returns, and excess capacity.

24  HERCULES' proposals for the carbon fiber industry included rationalizing excess

25  capacity and exploring areas for cooperation.

26      63.    In light of HERCULES' proposed agenda, its discussions with

27  MITSUBISHI and TOHO on the need to increase and/or not ruin prices, and, in

28  particular, the involvement of Burns, Aoyama, Sasawaki, Nogami, Yamada, and

1   Yoshida and, in light of their subsequent anticompetitive activities, Plaintiff alleges, on

2   information and belief, that HERCULES, MITSUBISHI and TOHO discussed the

3   fixing of prices, and allocation of customers and markets in the United States and

4   elsewhere for carbon fiber.  In addition, on information and belief, and based upon the

5   routine practice of sharing of information between and among the competitors,

6   HERCULES shared its discussion of fixing prices and allocation of customers and

7   markets in the United States and elsewhere with TORAY.

8        64.    In April 1993, at the JEC Composites Show in Paris, France, Nogami

9   (GRAFIL/NEWPORT/MITSUBISHI), Iwanari (TORAY/SOFICAR) and Haruki

10   (TOHO) held a meeting at which they discussed the fact that their companies could not

11   sell to the same customers without interfering with each company's profits.  The

12   companies agreed to divide the carbon fiber market in Europe by dividing the

13   customers for these products so that only one company would sell to a particular

14   customer.  In addition to allocating the customers, the three companies agreed to

15   establish "floor prices" for carbon fiber.  The floor price was the minimum price at

16   which the companies agreed they would sell a particular product.  Each of the

17   companies manufactured carbon fiber comparable to the other companies' carbon

18   fibers.  In addition, each of the companies had the capability of readily manufacturing

19   comparable fibers.  For example, TORAY's T300 12K carbon fiber was comparable to

20   TOHO's HTA 12K carbon fiber.  (Establishing a "floor price" for the carbon fiber

21   allowed for some small variation in selling to customers to disguise the price fixing,

22   and prevented customers from going to competitors and obtaining a price below the

23   agreed-upon floor price.)  Nogami told Roberts (GRAFIL Europe) to keep this

24   information to himself.  Roberts knew these arrangements were illegal and refrained

25   from putting anything in writing concerning them.  He considered it the Japanese way

26   of doing business.

27        65.    Also at the April 1993 JEC Composites Show in France, the companies

28   met and agreed upon the floor price for 12K, 24K and 48K carbon fiber, and any

1   product with a 700 prefix for the remainder of 1993 and for 1994.  These four products

2   comprised at least 90% of the carbon fiber sales in Europe.  The floor price for 12K was

3   agreed to be 140 French francs per pound.  This represented an increase from the

4   existing 135 French francs per pound price.  After this price was agreed upon, the

5   companies generally adhered to it.  The companies also agreed that they would increase

6   carbon fiber prices in the second half of 1994 and would raise prices at 6 month or 1

7   year intervals depending upon customers.  Nogami was wary of increasing carbon fiber

8   prices too much or too often and raising suspicion among customers of the collusion.

9   The fundamental mechanism of the Price Fixing Scheme was agreement upon the

10   division of customers and floor pricing for carbon fiber.

11        66.    On August 4, 1993, Nogami, President of GRAFIL, met with Lynch of

12   HERCULES.  Lynch stated that HERCULES had a good impression of GRAFIL

13   because it engaged in orderly marketing and did not undercut carbon fiber prices.

14   HERCULES was prepared to sell standard modulus carbon fiber to NEWPORT at an

15   increased price of $11.00/lb. and would rebate NEWPORT if HERCULES sold fiber to

16   other prepreggers at a lower price.  Nogami reported this meeting to Sasawaki, General

17   Manager, Advanced Composites Material Division of MITSUBISHI.

18        67.    Nogami was willing to purchase higher priced carbon fiber as part of the

19   Price Fixing Scheme.  Higher carbon fiber prices would benefit GRAFIL and the

20   MITSUBISHI GROUP, and would not injure NEWPORT so long as other prepreggers

21   were forced to pay the same higher prices.

22        68.    In the fall of 1993, Ichikawa of TORAY discussed 1994 U.S. carbon fiber

23   prices with Yamada of TOHO, and then passed this information along to DeLong of BP

24   AMOCO.  From 1993 through at least 1999, TORAY and BP AMOCO routinely

25   exchanged information on other carbon fiber manufacturers' prices, capacity, plans,

26   customers and market share.

27        69.    On September 16, 1993, Nogami, President of GRAFIL, met with DeLong

28   and Beasley of BP AMOCO and executives of HERCULES to discuss the continued

1  expansion of price increases for carbon fiber.

2      70.    Between September 26 and October, 1993, Roberts (GRAFIL, Europe)

3  met with Nogami and Ayoami at MITSUBISHI's headquarters in Japan.  Nogami

4  informed Roberts of the Price Fixing Scheme and explained to Roberts that it was

5  necessary to divide customers to keep all the Defendant and Co-conspirator companies

6  profitable.  He instructed Roberts to think about what customers Roberts believed

7  MITSUBISHI should serve.

8      71.    In October 1993, at Yamada's request, Yoshida (TOHO CARBON

9  FIBERS) met with Nogami of GRAFIL/NEWPORT/MITSUBISHI to discuss carbon

10  fiber pricing to CYTEC.  It was only after Yoshida received assurances from Nogami

11  that GRAFIL would not undercut TOHO CARBON FIBERS' carbon fiber price that

12  Yoshida quoted a higher price to CYTEC.

13      72.    On November 23, 1993, Nogami (GRAFIL/NEWPORT/MITSUBISHI)

14  wrote Aoyama and Sasawaki of MITSUBISHI with proposed carbon fiber floor prices

15  for GRAFIL Europe, SOFICAR (TORAY), and TENAX (TOHO) for 1994.  This

16  memorandum was in anticipation of meetings between Nogami, Iwanari and Haruki.

17      73.    On November 25, 1993, Aoyama of MITSUBISHI wrote Nogami

18  concerning his upcoming meetings with TORAY and TOHO and explained that

19  Nogami should tell TORAY and TOHO not to pursue MITSUBISHI's customers based

20  upon orderly marketing and that if TORAY or TOHO (SOFICAR or TENAX) did so,

21  then MITSUBISHI would retaliate.  Aoyama also instructed Nogami to tell TORAY

22  and TOHO in Europe that MITSUBISHI was opposed to, and would oppose any

23  attempt by them to export low-priced carbon fiber from Europe into the United States,

24  and that if TORAY or TOHO did so MITSUBISHI would retaliate.  Nogami was to

25  report on this discussion so that MITSUBISHI in Japan could provide the same

26  message to Ichikawa of TORAY and Morita of TOHO.  Thereafter, the parties agreed

27  upon carbon fiber prices and customer allocations.

28

COMPLAINT FOR VIOLATION OF § 1 OF THE SHERMAN ACT

CASE NO. _____

### C. The Continuation of the Price Fixing Scheme in 1994

74.    TORAY's January 1994 business plan for Europe was to achieve an allocation of intermediate and high modulus carbon fibers with TOHO and MITSUBISHI and, through orderly marketing, to achieve a global monopoly in cooperation with MITSUBISHI with respect to MJ grade carbon fibers.

75.    In early 1994, TOHO exchanged assurances with TORAY that neither would accept orders for less than $11.00 for the standard modulus carbon fiber recreation market. Yoshida of TOHO CARBON FIBERS followed Yamada's instructions and would not sell standard modulus carbon fiber for less than $11.00. MITSUBISHI was also a party to this understanding and TOHO, TORAY, and MITSUBISHI agreed to and then implemented standard modulus carbon fiber price increases from $10.00 to $11.00/lb.

76.    On March 29, 1994, Aoyama of MITSUBISHI informed Nogami of GRAFIL/ NEWPORT/MITSUBISHI of the parties' understanding and based on communications in Japan with TORAY and TOHO, that TORAY was making efforts to increase the price of standard modulus carbon fiber in the United States as much as possible, and TOHO stated that it was not accepting orders below $11.00 a pound for standard modulus carbon fiber in the United States under any circumstances.

77.    On March 30, 1994, Nogami of GRAFIL/NEWPORT/MITSUBISHI reported back to Aoyama of MITSUBISHI that in return for NEWPORT's having agreed to pay $11.00 (up from $9.50) for purchases of HERCULES standard modulus carbon fiber in the second half of 1993, there was an agreement that BP AMOCO's lowest price for standard modulus carbon fiber would be $12.00 and HERCULES' price would be $11.00 in 1994. Nogami reported that TOHO and TORAY had not sold standard modulus carbon fiber below $11.00/lb. in the United States.

78.    On or about May 3, 1994, MITSUBISHI, TORAY and TOHO agreed on a price increase which would result in GRAFIL's price for standard modulus carbon fiber in Europe increasing from $10.50 to $11.00. The three companies were concerned that

1  if the price were further increased within the year, especially at the same time by each

2  company, customers might resist or become suspicious about price fixing or collusion,

3  so all three agreed to act carefully.

4      79.    On or about June 27, 1994, TORAY executive Kawamura met with BP

5  AMOCO Director DeLong, Product Manager Beasley and Assistant Product Manager

6  McBee.  It was reported at the meeting that the prices TORAY and BP AMOCO

7  charged Fiberite for carbon fiber were identical.

8      80.    Both TORAY and BP AMOCO knew that substantial amounts of the price

9  fixed T-300 3K, 6K, and 12K were used for United States Government end use

10  applications, principally military and space hardware.  For example, TORAY and BP

11  AMOCO both knew that Fiberite purchased such fiber for United States Government

12  end use applications, and at the June 27, 1994 meeting they discussed Fiberite's request

13  to purchase T-300-6K fiber for use in the F-16 fighter aircraft.

14      81.    Fiberite's Greenville division manufactured prepreg for military and

15  aerospace use by McDonnell Douglas and Northrop.  A significant amount of the

16  carbon fiber used to make the prepreg was sold by BP AMOCO.  Fiberite also

17  purchased carbon fiber from TORAY and HERCULES.  Fiberite manufactured prepreg

18  for satellite structures for which TORAY and BP AMOCO supplied the carbon fiber.

19      82.    As of July 1, 1994, TORAY's business plan for the next several years was

20  to avoid competition with BP AMOCO for sales of T-300 3K and 6K carbon fiber, to

21  continue the exclusive distributorship with BP AMOCO, to maintain prices of carbon

22  fiber, and to review the arrangement annually.  TORAY also envisioned a five firm

23  system in the industry consisting of itself, TOHO, MITSUBISHI, HERCULES and BP

24  AMOCO.

25      83.    In September 1994, Yamada (TOHO) told Yoshida (TOHO CARBON

26  FIBERS) that TORAY had provided assurances that it would increase carbon fiber

27  prices in the United States.  Confident that no one would undercut his price, Yoshida

28  offered a higher, take-it-or-leave-it price to Dunn of TTI and told Dunn that no other

1  company would offer any lower price.

2        84.   At the upcoming BP AMOCO-TORAY meeting to take place in

3  September 1994, DeLong intended to discuss with TORAY that BP AMOCO either

4  had to be free to compete and, thereby create disruption in the market for availability

5  and/or price of carbon fiber or continue the resale relationship to BP AMOCO's and

6  TORAY's mutual benefit.  The parties agreed to continue the pricing and resale

7  relationship to their mutual benefit and to the exclusion of competition in the carbon

8  fiber market.

9        85.   On or about November 19, 1994, Nogami met with Yoshida of TOHO

10  CARBON FIBERS.  Yoshida assured Nogami that TOHO was in compliance with the

11  Price Fixing Scheme and had not made offers to sell carbon fiber to Aldila, Fiberite and

12  CYTEC at a price below $11.50.  Yoshida agreed that any price below $11.50 was not

13  good.

14        86.   On November 21, 1994, TORAY Section Manager Maruyama, and Kondo

15  of KBK met with DeLong and Beasley of BP AMOCO.  In response to DeLong's

16  refusal to accept TORAY's proposed volume of 3K carbon fiber sales to BP AMOCO,

17  Maruyama threatened to cancel the 3K/6K exclusivity arrangement.  Maruyama told

18  Kondo afterwards that he did not intend to cancel the arrangement because TORAY did

19  not want competition from BP AMOCO.

20  **D.**    **The Continuation of the Price Fixing Scheme in 1995**

21        87.   The price DeLong set for BP AMOCO carbon fiber was established and

22  given to him by TORAY.  TORAY established its price for carbon fiber in collusion

23  with TOHO and MITSUBISHI.  In addition, Kondo was KBK, Inc.'s regional manager

24  and its only executive.  KBK, located in Atlanta, Georgia, was the importer of TORAY

25  fiber for sale to BP AMOCO for resale in the United States.  On January 9, 1995, as a

26  result of a carbon fiber price agreement between TORAY and executives of TOHO,

27  Matsubara and Kawamura of TORAY instructed Kondo to inform DeLong that TOHO

28  was selling 12K carbon fiber to U.S. customers for $12.00 per pound (and perhaps

1    $11.50 per pound to its large U.S. customers), and that BP AMOCO should price

2    TORAY's 12K carbon fiber at $11.75 to $12.00 per pound for sales to CYTEC and

3    HEXCEL.  In addition, the FOB Japan price that BP AMOCO was to pay TORAY for

4    TORAY 12K under the resale arrangement was calculated based upon BP AMOCO's

5    reselling to its customers at the agreed upon $11.75-$12.00 fixed price.

6       88.    On February 7, 1995, Maruyama (TORAY) met with DeLong and Beasley

7    (BP AMOCO) and Kondo (KBK).  Maruyama told DeLong and Beasley that TORAY

8    was negotiating with Ciba, a European prepreg manufacturer, to sell carbon fiber to

9    Ciba.  This was a major sale for some 75,000 to 100,000 pounds of T-300 3K and 12K

10    carbon fiber per year.  Ciba had also approached BP AMOCO concerning the same

11    project.  TORAY told BP AMOCO that it would not finalize the agreement unless it

12    determined that this was a new project and would consult with BP AMOCO concerning

13    the proposed sale if TORAY did go forward with an offer to Ciba.  BP AMOCO

14    wanted the matter to be handled carefully so as not to lower the 3K market price.

15       89.    On February 7, 1995, Maruyama of TORAY met with DeLong and

16    Beasley of BP AMOCO and proposed the 3K carbon fiber price for BP AMOCO's 3K

17    carbon fiber sales for the F-16 fighter aircraft.  Consistent with the parties' course of

18    dealing, TORAY and BP AMOCO subsequently reached agreement on the price of this

19    product.

20       90.    On February 7, 1995, TORAY Deputy Director Maruyama and Kondo of

21    KBK met with DeLong and Beasley.  Maruyama informed DeLong that TOHO was

22    selling 12K carbon fiber into the U.S. market at $11.50 per pound.

23       91.    On March 1, 1995, DeLong informed DeLuca (Vice President, BP

24    AMOCO) that Ichikawa (Director, General Manager, Advanced Composites Materials

25    Division, TORAY) was big on strategy and spoke with the senior managers of all of the

26    carbon fiber producers in Japan.

27       92.    On March 26, 1995, TORAY executive Kawamura and Kondo of KBK

28    met with DeLong.  Kawamura told DeLong that MITSUBISHI was expected to raise

carbon fiber prices in April and that a top level meeting between TORAY Director Ichikawa and Yamada of TOHO was planned. DeLong asked to be provided with information concerning the result of the Ichikawa-Yamada meeting.

93.    At the March 26, 1995 meeting, DeLong told TORAY that there was a possibility of competition with TORAY concerning carbon fibers for compressed natural gas tanks. He wanted to discuss the issue with TORAY and described a past example where TORAY and BP AMOCO had apparently agreed upon bids or otherwise allocated sales of carbon fiber to Brunswick rather than engage in competition.

94.    On March 31, 1995, DeLong asked Kondo to report to him on the meeting between Yamada of TOHO and Ichikawa of TORAY at which DeLong understood TOHO and TORAY had agreed to a carbon fiber price of $11.75-$12.00 per pound for standard modulus carbon fiber. TOHO was charging $11.50 per pound for the carbon fiber, and DeLong was concerned TOHO was not following the agreement. BP AMOCO monitored TOHO's pricing during the year to ensure that TOHO was following the agreement.

95.    At the SACMA conference in Washington, D.C. in April 1995, Yoshida of TOHO CARBON FIBERS met with Tucci and Burns of HERCULES. HERCULES told Yoshida that HERCULES wanted to raise the carbon fiber standard modulus price to $13.00 so that everyone in the industry could justify bringing more capacity online. This meeting took place in a hotel room at the Ritz Carlton because Yoshida, Tucci and Burns did not want to be seen by other attendees who might suspect them of colluding.

96.    In April 1995, TORAY's plans were to take carbon fiber inventory bound for North America and divert it to Japan and East Asia as much as possible in order to create a sense of shortage in the North American market and then to push forward with a large carbon fiber price increase offensive in North America.

97.    Prior to the May 1995 SAMPE conference, TORAY was in contact with TOHO, MITSUBISHI, BP AMOCO and HERCULES to discuss carbon fiber price

1   increases.  TORAY made the carbon fiber suppliers aware that prices in the United

2   States were lagging and that it wanted to increase the price of standard modulus T-700

3   carbon fiber to $15.00 per pound by July 1995 and to $16.00 per pound by January

4   1996 and raise the price of T-300 carbon fiber to $14.00 per pound by July 1995.

5        98.   At the May 1995 SAMPE conference in Anaheim, California, TORAY,

6   TOHO, MITSUBISHI, BP AMOCO and HERCULES met to discuss carbon fiber price

7   increases.  Ichikawa (TORAY) met with representatives from MITSUBISHI,

8   HERCULES, BP AMOCO, and TOHO.  Maruyama (TORAY) met with

9   representatives of MITSUBISHI, HERCULES, BP AMOCO, and other companies.

10   DeLong and Deluca (BP AMOCO) met with TORAY representatives.  Burns

11   (HERCULES) also met with Ichikawa and Katsumoto (TORAY) and discussed present

12   and future carbon fiber pricing.  Nogami (GRAFIL/NEWPORT/MITSUBISHI) met

13   with Ichikawa (TORAY).  At this SAMPE meeting, the Defendants and their Co-

14   conspirators agreed to follow the price increases proposed by TORAY prior to the

15   meeting which established price increases in the carbon fiber markets for 1995 and the

16   beginning of 1996.

17        99.   At the May 1995 SAMPE conference in Anaheim, California, TOHO

18   President Furuye, Yamada (TOHO), Yoshida (TOHO CARBON FIBERS) and

19   Ichikawa, Maruyama, and Kawamura (TORAY) agreed upon floor prices for different

20   carbon fiber tensile strengths in the United States market.  As a result of this agreement,

21   TORAY and TOHO CARBON FIBERS raised carbon fiber prices to customers in the

22   United States.

23        100.   At the May 1995 SAMPE conference in Anaheim, California, Burns, and

24   Tucci of HERCULES met with Ichikawa of TORAY.  HERCULES complained that

25   the carbon fiber business should not be unprofitable when there were only five

26   companies in the world and that the product should be priced in accordance with its

27   performance.  TORAY stated that it agreed with this thinking and that it had already

28   announced a price increase for T-700 carbon fiber up to $16 per pound and

1  HERCULES indicated its understanding.  HERCULES further announced that it

2  wanted to find a way to work together with TORAY.

3      101.  At a meeting held at the SAMPE conference in Anaheim, California on

4  May 5, 1995, TORAY and MITSUBISHI agreed the floor price for 12K carbon fiber

5  would be $15 per pound.  Among the people at this meeting were Nogami

6  (GRAFIL/NEWPORT/MITSUBISHI) and Kawamura (Manager Torayca Marketing

7  Overseas, Carbon Fibers Department, TORAY Industries/TORAY GROUP).  They

8  also established a price for GRAFIL's G34-700, and TORAY's T-300 carbon fiber and

9  other products.

10     102.  Through the 1995 SAMPE meetings in California, TORAY was able to

11 create an industry-wide consensus with the major carbon fiber competitors, BP

12 AMOCO, HERCULES, TOHO, MITSUBISHI, and itself, to raise carbon fiber prices.

13 Kawamura (TORAY) reported to others at TORAY that the environment for further

14 increasing the market price of carbon fiber in the United States had been established.

15     103.  Within a few months following the May 1995 SAMPE conference,

16 members of the TORAY Group, TOHO Group, MITSUBISHI Group, BP AMOCO,

17 and HERCULES implemented increases in carbon fiber prices in the United States.  In

18 accordance with the agreements reached at SAMPE in California, TORAY set the price

19 for T-700 carbon fiber at $15.00 a pound for the second half of 1995 and at $16.00 per

20 pound for the beginning of 1996.

21     104.  On May 7, 1995, DeLong of BP AMOCO assured TORAY that BP

22 AMOCO intended to produce 300,000 to 400,000 pounds of carbon fiber per year at its

23 Rock Hill plant but would proceed carefully so as to maintain a balance between carbon

24 fiber supply and demand.

25     105.  On May 9, 1995, TORAY Director Ichikawa, General Manager Maruyama

26 Kawamura, General Manager Iwanari, Section Manager Mito, and Kondo of KBK, met

27 with BP AMOCO Vice President DeLuca and General Manager DeLong.  Among other

28 things discussed, BP AMOCO indicated that it had the ability to follow a price increase

1   up to around $14.00/lb.  BP AMOCO stated that it was offering customers a sales price

2   of $14.00/lb. based upon the new increased FOB Japan price with TORAY of

3   $12.59/lb.

4        106.   On May 10, 1995, TORAY Director Ichikawa met with HEXCEL Vice

5   Presidents Lahey, Sandercock, and Chornet.  TORAY informed HEXCEL that TORAY

6   would sell T-800H carbon fiber at different prices depending upon whether the end use

7   was for sporting goods or aerospace applications.  The Defendants and their Co-

8   conspirators employed similar measures for maintaining artificial price structures for

9   carbon fiber, including using different names for the same carbon fiber product

10   depending upon whether its end use was aerospace or sporting goods.  This was

11   intended to conceal the duel pricing structure and could avoid raising the issue of

12   whether most favored nation clauses in contracts for government products containing

13   carbon fiber were being violated or requirements that the government be informed of

14   the same or similar products.

15        107.   On June 28, 1995, Yoshida (TOHO) met with Nogami

16   (GRAFIL/NEWPORT/ MITSUBISHI) to confirm that MITSUBISHI had followed the

17   carbon fiber price increase agreed to at the 1995 SAMPE conference.  Following this

18   meeting, Yoshida reported to Sekiguchi (TOHO) that MITSUBISHI was complying

19   with the agreement so that TOHO could offer a price of $13.50 per pound for carbon

20   fiber to Aerojet.

21        108.   On July 1, 1995, in accordance with the carbon fiber price increase

22   agreement reached at the May 1995 SAMPE show in California, TORAY and TOHO

23   increased the price of carbon fiber to Aerojet.

24        109.   On July 7, 1995, BP AMOCO noted that it regarded its T-650-35 12K

25   carbon fiber as a comparable product to TORAY's T-700 carbon fiber or TOHO's G30-

26   700 carbon fiber and would follow TORAY's T-700 carbon fiber pricing in its pricing

27   of T-650 carbon fiber.

28        110.   T-700 carbon fiber is a benchmark price in the industry.  Based on that

1   price, the remainder of standard and intermediate modulus carbon fiber prices could be

2   determined.

3       111.   On October 11, 1995, Beasley, DeLong, Ichikawa, Maruyama, Kawamura

4   and KBK, Inc. executives met in Hakone, Japan.  At this meeting, TORAY informed

5   BP AMOCO of the prices BP AMOCO would charge various BP AMOCO customers

6   for carbon fiber for 1996 and the volume of carbon fiber that BP AMOCO would

7   produce.  BP AMOCO agreed to these prices and volumes.  These prices were

8   consistent with the price for TORAY carbon fiber in 1996.  BP AMOCO's major 3K

9   and 6K customers were Fiberite and HEXCEL.  BP AMOCO then implemented these

10   price increases.

11       112.   Meetings between TORAY and BP AMOCO setting carbon fiber prices

12   and volume production for carbon fiber were held every year in Japan in September,

13   October or November from 1993 through (at least) 1998.  There would also be four to

14   seven additional meetings each year to monitor price compliance and pricing and

15   volume issues.  These meetings would take place at BP AMOCO headquarters in the

16   United States or at the SAMPE show in the United States.  The Japanese meetings

17   would be attended by Ichikawa, Maruyama and Kawamura of TORAY, DeLong and

18   Beasley of BP AMOCO and Matsubata, Mito and Nonoyama of KBK Tokyo.  The

19   same people would meet in the United States, except that Kondo of KBK would attend

20   for KBK in the U.S.  Typically, TORAY and BP AMOCO would maintain the agreed

21   upon price for the entire year.  At these meetings, prices and production would be set

22   based on prices and production allocation which had been agreed upon by HERCULES,

23   TOHO, and MITSUBISHI in discussions with TORAY.  When TORAY instructed

24   DeLong to raise carbon fiber prices and he expressed doubt that customers would go

25   along with it, he was told that the other carbon fiber suppliers would follow suit.

26   DeLong described the Japanese carbon fiber companies as "Japan, Incorporated."  By

27   purchasing TORAY 12K carbon fiber, BP AMOCO was able to concentrate on making

28   3K for the lucrative aerospace market.

113.   In November 1995, Yoshida (TOHO) met Burns (HERCULES) at a Society for the Advancement of Composite Materials ("SACMA") conference in San Diego, California in the courtyard of the Catamaran Hotel.  Burns and Yoshida took care not to be seen together because of their concern that this would raise suspicions of collusion.  Burns told Yoshida of HERCULES' 12K standard modulus pricing to Aldila and others.  Yoshida received assurances from Burns that HERCULES' prices were in the $13.00 to $14.00 per pound range and no less than $12.50 to Aldila.  Yoshida told Burns that $14.00 was the appropriate price to Aldila.  He did this to avoid Burns' undercutting TOHO's price and Burns agreed not to undercut the price.  Following the meeting with Burns, Yoshida wrote in a memo that it was crucial that Yamada (TOHO) meet with BP AMOCO to pass on the information that TOHO was raising the price to $14.00 to Aldila.

114.   In November 1995, Yoshida (TOHO) spoke with Burns (HERCULES) and agreed not to sell standard modulus carbon fiber at less than $12.50 a pound.  Yoshida also spoke with Nogami (GRAFIL/NEWPORT/MITSUBISHI) who agreed that MITSUBISHI would not sell standard modulus carbon fiber at less than $12.50 per pound except in special cases of long-term customers, and that the next year's price would be $13.00 per pound.  Based on the information Yoshida obtained from MITSUBISHI and HERCULES, Yoshida told Yamada (TOHO) that TOHO could set the price of standard modulus carbon fiber sold to CYTEC at $12.75 a pound.

115.   HERCULES sold IM7 fiber to Alliant Techsystems ("Alliant") for use in constructing the Space Shuttle.  IM7 commanded a very high price.  Alliant asked TORAY and Sasaki of MITSUBISHI to qualify fiber to compete with IM7.  On August 23, 1995, Ochi, a MITSUBISHI executive wrote back to Nogami concerning the Alliant inquiry and explained that MITSUBISHI had available carbon fiber that was probably suitable and cost competitive (MR50K-12M).  However, MITSUBISHI preferred to avoid cost competition with HERCULES.  On information and belief, TORAY also refused to compete for the Alliant business, consistent with TORAY's

1  March 1996 disclosure to HEXCEL that TORAY and TOHO had agreed that United

2  States Government demand was allocated to HERCULES and BP AMOCO.

3  MITSUBISHI and HERCULES had reached a similar understanding that MITSUBISHI

4  would not compete for HERCULES' United States Government business.

5      116.   Although capable of doing so, from 1993 through 1999, or later,

6  MITSUBISHI and TOHO did not compete for carbon fiber sales for United States

7  Government military or aerospace consumption.

8      117.   Although capable of doing so, from 1993 through 1999, or later, TORAY

9  did not compete for carbon fiber sales for United States Government military or

10  aerospace consumption, with the limited exception of certain specialty carbon fibers,

11  such as very high tensile strength T-1000 carbon fiber (e.g., to Thiokol for missile

12  structures) or very high modulus carbon fiber (for satellite applications).

13  **E.    The Continuation of the Price Fixing Scheme in 1996**

14      118.   On or about January 30, 1996, executives of MITSUBISHI, TORAY and

15  TOHO met, discussed, and agreed upon the prices for Taiwan sales of carbon fiber.

16      119.   In early 1996, Nogami (GRAFIL/ MITSUBISHI) met in Japan with

17  Hirota, Morita, Yamada and Yamamoto, senior officials of TOHO, and exchanged

18  pricing information on carbon fiber in the United States market.

19      120.   On or about February 15, 1996, Hirota, Yamamoto, Yamada, and Hiroma

20  (TOHO) met with executives of MITSUBISHI in Japan and agreed upon specific

21  pricing for G30-500 12K and 030-700 12K (standard modulus) carbon fiber products.

22  Yoshida (TOHO) was told to, and did, follow these prices in the United States.

23      121.   In early 1996 HEXCEL was negotiating with HERCULES for the

24  acquisition of HERCULES' carbon fiber business.  The acquisition was completed in

25  June 1996.

26      122.   At the March 1996 SAMPE conference in Anaheim, California, TORAY

27  executives Kawamura, Ichikawa, Maruyama, Kuroiwa, and Okumura held meetings

28  with executives of the MITSUBISHI Group, the TOHO Group, BP AMOCO and

1  HERCULES to discuss topics such as: carbon fiber pricing, market allocations,

2  noncompete agreements, concerns over competition, carbon fiber production capacity

3  and possible alliances. Kuroiwa of TORAY cautioned that because the U.S. is strict

4  about competitor pricing discussions, such matters should be excluded from the record.

5  Instead, TORAY orally communicated about such matters during the SAMPE meetings

6  and excluded them from the written record.

7       123.   At these March 1996 SAMPE meetings in Anaheim, California, TORAY,

8  executives of the MITSUBISHI GROUP, the TOHO GROUP, BP AMOCO and

9  HERCULES exchanged pricing information and discussed target prices for standard

10  modulus and intermediate modulus carbon fiber. They agreed to try to achieve a $2.00

11  price increase in standard modulus carbon fiber to a floor price of $15.00 per pound,

12  and a higher price increase in intermediate modulus carbon fiber, which was selling in

13  the $22.00-$24.00 price range.

14       124.   Also at the March 1996 SAMPE conference in Anaheim, California,

15  Yoshida (TOHO CARBON FIBERS) and Sekiguchi (TOHO) met with Ichikawa and

16  Maruyama (TORAY) and Iwanari (SOFICAR). The TORAY representatives told

17  Yoshida the prices for high modulus, HI A grade, and T-700 carbon fiber. A specific

18  price was discussed for T-700 carbon fiber. The discussion also included raising prices

19  for intermediate modulus (IM) grades of carbon fiber. Yoshida told Maruyama that

20  TOHO would follow TORAY'S carbon fiber prices. This discussion gave TOHO

21  assurances that it could raise its carbon fiber prices. The month after the SAMPE

22  meeting, Yoshida announced a $1.00 per pound price increase in the price of its carbon

23  fiber. Yoshida understood that this price increase could not have been maintained had

24  TORAY not raised its carbon fiber price as well.

25       125.   On March 1 and 6, 1996, BP AMOCO's DeLong met with TORAY

26  Department General Manager Maruyama. In memos dated February 28 and March 2,

27  1996, Kondo, regional manager of KBK (TORAY's agent for sales to BP AMOCO),

28  reports that DeLong was opposed to TORAY's request that TOMAC executive

Kuroiwa participate in the BP AMOCO and TORAY meetings because DeLong was afraid of the leaking of information that TORAY and BP AMOCO had been manipulating carbon fiber prices and allocating customers. TOMAC was a TORAY subsidiary that sold carbon fiber into the United States. BP AMOCO and TORAY understood that they were manipulating prices and allocating customers.

126. On March 25, 1996, Maruyama and Ichikawa of TORAY met with Habermeier and Lahey of HEXCEL and discussed a preexisting division of the carbon fiber market whereby recreational carbon fiber sales belonged to TOHO and United States government carbon fiber demand was allocated to AMOCO and HERCULES.

127. On March 25, 1996, TORAY Director Ichikawa, General Manager Maruyama, Kawamura, Matsubara, and Kondo of KBK, met with BP AMOCO's DeLong and told DeLong of TORAY's meeting with HEXCEL at which TORAY had explained to HEXCEL that recreational fiber sales belonged to TOHO and United States government demand was allocated to AMOCO and HERCULES.

128. On April 23, 1996, in response to HEXCEL's letter to TOHO, Yoshida (TOHO CARBON FIBERS) called Habermeier (HEXCEL) to set up a meeting with Koga (TOHO) for the purpose of forming a closer alliance with respect to carbon fibers.

129. On June 24 and 25, 1996, Habermeier, Lahey, and Hisatomi (HEXCEL) met in Tokyo with TOHO executives Koga (President), Takeda, (Executive Vice President), Furoye (Senior Managing Director Carbon Fibers), Izunome (Director and Deputy Executive V.P.), Hirota, (Manager Carbon Fibers/Overseas Director), and Yamamoto (Overseas Sector) and Yoshida (President of TOHO CARBON FIBERS) to discuss a potential alignment between HEXCEL and TOHO.

130. On June 24, 1996, Habermeier, Lahey, and Hisatomi (HEXCEL) met in Tokyo with MITSUBISHI executives Kataoka (Executive Vice President), Sasawaki (Managing Director), Abe (General Manager Carbon Fibers), Tada (Director Technology), to discuss close cooperation with MITSUBISHI.

131.   On June 24, 1996, Habermeier, Lahey, and Hisatomi (HEXCEL) met in Tokyo with TORAY executives Mitsui (Executive Vice President), Ichikawa, (Vice President Advanced Composite Materials), and Sakai (General Manager, Advanced Composite Materials) to discuss cooperation.

132.   On June 27, 1996, HEXCEL completed its purchase of HERCULES, thereby making HEXCEL both a carbon fiber and prepreg manufacturer. At that time, Burns resigned from HERCULES and became the President of the Carbon Fibers Business Unit for HEXCEL. Burns had pricing authority over HEXCEL's carbon fiber sales.

133.   At the 1996 SAMPE conference in California, TORAY, GRAFIL and TOHO held meetings to set prices and allocate customers. Kawamura (TORAY) met with executives from GRAFIL to discuss carbon fiber pricing. On April 4, 1996, Kuroiwa reported to Maruyama (TORAY) that he had met with TOHO and was deleting the sensitive carbon fiber pricing information from the record because it could be subject to severe investigation and prosecution in the United States.

134.   In the months following the 1996 SAMPE conference, carbon fiber prices increased for both standard modulus and intermediate modulus carbon fiber consistent with the understandings reached at the various 1996 SAMPE meetings. For example, in about April and May of 1996, GRAFIL increased its standard modulus carbon fiber prices by $0.50-$0.75 per pound to its various customers. Also, in about May of 1996, TOHO CARBON FIBERS increased its standard modulus carbon fiber prices from approximately $14.75 per pound to $15.75 per pound. In about June of 1996, TORAY raised its intermediate carbon fiber prices to $28.00 per pound, continuing to aim for $30.00 per pound.

135.   During a May 1996 meeting between DeLong of BP AMOCO and Furoye, Yamada, Hirota and Yamamoto of TOHO, DeLong requested and TOHO agreed that TOHO would not export carbon fiber from TENAX in Europe into the United States market in order not to disturb the United States carbon fiber market with additional

1  supply which would result in lower prices.  TOHO stated it would not cut its carbon

2  fiber price to gain market share.

3      136.   In June 1996, Yoshida (TOHO) met with Kuroiwa (TORAY) for lunch at a

4  sushi bar in Palo Alto, California.  Kuroiwa informed Yoshida that the price for

5  TORAY's T-700 carbon fiber had to increase to a specific price.  Yoshida gave

6  Kuroiwa TOHO's carbon fiber prices.  Yoshida agreed to raise the price of TOHO's

7  comparable fiber and told TORAY that TOHO was planning a carbon fiber price

8  increase for January 1, 1997.  Kuroiwa also gave a target price for intermediate

9  modulus carbon fiber at $30.00 per pound.  Yoshida told Kuroiwa that TOHO would

10  follow the proposed carbon fiber price increase.  Kuroiwa advised that his written

11  report on the meeting should be destroyed after reading.

12      137.   Between July 11 and July 14, 1996, Kawamura and Yamazaki of TORAY

13  met with BP AMOCO, including DeLong.  Among other things, DeLong stated that he

14  intended to raise 3K and 6K carbon fiber prices for aerospace applications in 1997 by

15  3-4%.  TORAY told BP AMOCO that it intended to increase the price of IM carbon

16  fiber to $28.00-$30.00.  This is the exact proposed price range for IM fiber that

17  TORAY had discussed with TOHO.

18      138.   On or about September or October 1996, Kuroiwa (TORAY) met Yoshida

19  (TOHO CARBON FIBERS) and told him the intermediate carbon fiber price TORAY

20  was quoting Aldila.  Kuroiwa told Yoshida that TORAY would not undercut TOHO's

21  price.  Kuroiwa and Yoshida agreed to increase the price of intermediate modulus

22  carbon fiber in the near future.

23      139.   On December 6, 1996, Kondo informed BP AMOCO that TORAY was

24  increasing the price of 3K, 6K and 12K for 1997.

25  **F.     The Continuation of the Price Fixing Scheme in 1997**

26      140.   At the May 7, 1997 SAMPE meeting in Anaheim, California, Yoshida

27  (TOHO) met with Burns (HEXCEL) at an obscure location to avoid being seen

28  together.  Yoshida gave Burns TOHO's carbon fiber pricing information about specific

1   customers, including M.C. Gill, a customer of both TOHO and HEXCEL.  After

2   receiving this information, Burns agreed HEXCEL would not undercut TOHO's carbon

3   fiber prices to these customers.

4        141.   At the May 1997 SAMPE meeting in Anaheim, California, Lee, the Chief

5   Executive Officer of HEXCEL and Habermeier, the new HEXCEL Chief Operating

6   Officer, met with Ichikawa and Maruyama of TORAY.  Lee stated that HEXCEL and

7   TORAY should protect their margins in carbon fiber by staying out of each other's

8   primary markets.  Lee said that HEXCEL and TORAY could "straddle" the market,

9   that HEXCEL had a strong presence in intermediate modulus fibers and TORAY had a

10  strong T-300 standard modulus carbon fiber product.  Lee stated that HEXCEL had no

11  plans to increase carbon fiber production and was focused on aerospace and military

12  applications.  Lee proposed achieving a successful market by continuing to eliminate

13  competition in the North American carbon fiber market.  Lee also suggested

14  cooperating in Europe.  As evidenced by the parties' subsequent behavior, TORAY and

15  HEXCEL did in fact agree to allocate markets and customers and stay out of each

16  other's primary markets.  In many respects this is simply a reaffirmation, extension, or

17  modest modification of the existing market division TORAY explained to HEXCEL in

18  March 1996.

19       142.   After HEXCEL purchased Ciba and HERCULES, Habermeier (HEXCEL

20  COO) tried to develop a T-300 carbon fiber "look-a-like" product using MITSUBISHI

21  PAN precursor that would be produced at the plant in Utah.  Habermeier asserted that

22  the project could have been successfully completed.  Boeing was prepared to conduct

23  qualification tests.  Lee (HEXCEL CEO) killed the project and never explained to

24  Habermeier why he did so.  This product would have competed with TORAY's T-300

25  carbon fiber, and, in particular, TORAY's substantial T-300 carbon fiber sales for

26  Boeing programs.

27       143.   Subsequent to purchasing HERCULES' carbon fiber facilities, and through

28  1999, or later, HEXCEL sold no carbon fiber in Japan.

144.   On June 10, 1997, at a dinner meeting at the Chart House restaurant in San Diego, California, Nogami (GRAFIL/NEWPORT/MITSUBISHI) told Randy Beck, president of Horizon Sports Technologies, Inc. ("HST"), that the carbon fiber manufacturers met in Japan to discuss carbon fiber prices and markets and that Nogami could not provide HST a price for 1998 until after such discussions took place in October or November.

145.   On September 7, 1997, Iwanari (TORAY/SOFICAR) met with Haruki and Scholten (TOHO/TENAX).  TOHO informed TORAY that a new TENAX line would be devoted to 12K production.  TOHO wanted to increase 1998 carbon fiber prices 3-5% and the parties agreed to have TOHO sound out the price increase.  Iwanari warned that his report on the meeting should be destroyed after reading.

146.   On October 10, 1997, Maruyama and Kuroiwa of TORAY met with DeLong and Beasley of BP AMOCO.  BP AMOCO sought TORAY's permission to sell carbon fiber to Boeing.  BP AMOCO was willing to consider such an arrangement (i.e., direct carbon fiber sales to Boeing) provided that TORAY did not mind.  According to TORAY's notes of the meeting, TORAY disapproved of such sales, and BP AMOCO made no such sales to Boeing.

147.   On November 25, 1997, TORAY increased the price of 3K, 6K and 12K carbon fiber to BP AMOCO for 1998.

148.   During the fall of 1997, Lee (HEXCEL CEO) told his subordinates that his business philosophy was that it was OK to violate the law so long as you did not get caught.  He made this philosophy clear to all of his staff, including Burns and Habermeier, among others.

## G.    The Continuation of the Price Fixing Scheme 1998

149.   In January 1998, Sakata of Torayca Marketing Overseas, Carbon Fibers Department, TORAY Industries, Inc. had a meeting with DeLong of BP AMOCO and provided BP AMOCO with TOHO's and MITSUBISHI's production, allocation and pricing plans for carbon fiber.

150.   In February 1998 at a conference in San Antonio, Texas, Katsumoto of TORAY addressed an audience and told carbon fiber suppliers that they had to work together to alleviate problems caused by overcapacity.  Present at the conference were Lemire of TOHO CARBON FIBERS and Burns of HEXCEL.

151.   On February 24, 1998, Kane of NEWPORT recounted to HST's Vice President Boretto, who recorded the conversation for the Federal Bureau of Investigation ("FBI") and the United States Department of Justice ("DOJ"), a conversation Kane had recently had with Mettenet of HEXCEL.  Kane said that HEXCEL and the MITSUBISHI GROUP were not supposed to be waging war with one another and that there were rules to the boxing match.  Kane further explained that TOHO, TORAY, and MITSUBISHI do the naked bunny hop in the same direction and explained that traditionally the companies staked out certain areas in the carbon fiber industry and honored one another's areas consistent with the Japanese business culture.

152.   On April 4, 1998, Ichikawa of TORAY told Beasley of BP AMOCO that TORAY wanted TOHO to stay in business.

153.   On June 1, 1998, at a dinner meeting in connection with SAMPE, Kawamura of TORAY told HST's president, Beck, who recorded the conversation for the FBI and DOJ, that TORAY and TOHO had divided up the Airbus carbon fiber business in Europe and that TORAY agreed to take the highly profitable 3K carbon fiber business in exchange for TOHO's getting the 6K and 12K carbon fiber business.

154.   On June 2, 1998, during the SAMPE conference in Anaheim, California, Morimoto, Ichikawa and Kawamura (TORAY) met with Sugao (MITSUBISHI/GRAFIL) and exchanged pricing and volume information concerning the carbon fiber market.

155.   At the 1998 SAMPE conference in Anaheim, California, TORAY, Sugao of GRAFIL, Yoshida (TOHO CARBON FIBERS) and Yamada of TOHO and DeLong of BP AMOCO met and exchanged information on market allocation and pricing for carbon fiber in the United States market.

156.   On July 29, 1998, Thompson (TORAY) told HST's Vice President Boretto that TORAY, TOHO, and MITSUBISHI share market information all the time and have an understanding with each other, apparently concerning their markets.

157.   On July 15, 1998, Maruyama and Morimoto (TORAY) met with Gary Beck, Randy Beck and Boretto of HST.  Maruyama acknowledged that TORAY could lower the price of T-700 carbon fiber and remain profitable, but that the main reason TORAY was not doing so was because such a price move would create a problem for TOHO and MITSUBISHI and their ability to remain profitable.  It was also acknowledged that maintaining the profitability of its competitors was a concern to TORAY.  This discussion was videotaped for the FBI and DOJ.

158.   On August 13, 1998, TORAY executives Ichikawa and Maruyama met with BP AMOCO's DeLong.  DeLong was in charge of BP AMOCO carbon fiber pricing and sales.  TORAY proposed that in order to maintain the parties' friendly relationship, TORAY and BP AMOCO should agree to share the volume of their 3K carbon fiber sales in the United States.  BP AMOCO agreed to do so.

159.   On or about August 14, 1998, Maruyama (TORAY) agreed to provide DeLong (BP AMOCO) pricing of 3K carbon fiber for 1999 so that DeLong could reply to HEXCEL by September 4, 1998.  Maruyama also had Kondo (KBK) inform DeLong that because BP AMOCO did not intend to lower its 3K price for the remainder of 1998, TORAY was also not going to lower its 3K prices for this time period.  Kondo also passed along Ichikawa's statement that to date the TORAY and BP AMOCO business had continued with good results pursuant to the gentlemen's agreement.

160.   On August 23, 1998, Knapp and Pierce (NEWPORT) met with Gary Beck, Randy Beck and Boretto of HST at the PGA show.  Knapp stated that he and Pierce had figured out that TORAY and the other Japanese carbon fiber companies were colluding in Japan.  Knapp stated he believed the companies were colluding to avoid the drop in prices that occurred in 1992.

161.   On August 26, 1998, Morimoto of TORAY COMPOSITES told HST's

1 | Vice President Boretto that TORAY and MITSUBISHI had instructed that carbon fiber
2 | prices not be lowered in order to maintain profits.  When questioned, Morimoto
3 | explained that he knew this because TORAY, TOHO, and MITSUBISHI have a carbon
4 | fiber association in Japan.  This conversation was recorded for the FBI and DOJ.

5 |       162.   In the summer and fall of 1998, TORAY and MITSUBISHI made efforts
6 | to solicit certain of each other's customers in the United States.  These activities were
7 | reported on and communicated back to Japan.  On December 2, 1998, Sasawaki
8 | (MITSUBISHI) wrote to Sugao (GRAFIL) that Koyama (TORAY) had met with
9 | Sasawaki and that they had agreed to cooperate to implement "orderly marketing" in
10 | the future and end the drop in carbon fiber prices which was occurring in 1998.
11 | Koyama had replaced Ichikawa as TORAY's contact with DeLong.

12 | **H.     The Continuation of the Price Fixing Scheme 1999**

13 |       163.   Sometime on or around November 11, 1999, Koyama, General Director of
14 | TORAY's ACM Division, acting at the instructions of TORAY Chairman Maeda,
15 | entered into an agreement with TOHO and MITSUBISHI RAYON to raise carbon fiber
16 | prices pursuant to a sequential coordinated price increase.  On November 19, 1999,
17 | TORAY announced a general 10% price increase for its carbon fiber.

18 | **I.     Additional Evidence of the Price Fixing Scheme**

19 |       164.   On information and belief, Plaintiff alleges that, in addition to the
20 | foregoing, from 1993 through 1999, the Defendants and their Co-conspirators
21 | communicated and acted on numerous other occasions to reduce or eliminate
22 | competition in the carbon fiber market, including the United States market.

23 |       165.   Throughout the Relevant Time Period, the Defendants and their Co-
24 | conspirators maintained artificial price structures, i.e., price structures that bore no fair
25 | market relationship to product cost.  These artificial structures could not have been
26 | maintained in a competitive environment.

27 |       166.   The intended purpose of the agreement among the Defendants and their
28 | Co-conspirators to fix prices, suppress output and allocate customers and markets was

1   to obtain higher prices than would have been obtainable in a competitive carbon fiber
2   market.

### FIRST CAUSE OF ACTION
#### (Violation of 15 U.S.C. § 1)
#### [The Sherman Act]

5   167.   Plaintiff incorporates herein by reference the allegations contained in
6   paragraphs 1 through 166 above.

7   168.   From 1993 through 1999, the Defendants and their Co-conspirators
8   entered into a contract, combination or conspiracy to unreasonably restrain trade and
9   commerce in violation of § 1 of the Sherman Act (15 U.S.C. § 1).

10   169.   The Defendants and their Co-conspirators, by their unlawful combinations,
11   illegally allocated and divided carbon fiber sales, customers and markets, controlled
12   carbon fiber output, and artificially fixed, raised, inflated, maintained and stabilized
13   carbon fiber prices and controlled other terms of trade for carbon fiber they sold in
14   California and throughout the United States and the remainder of the world.

15   170.   As a direct and proximate result of the unlawful conduct of the Defendants
16   and their Co-conspirators alleged herein, Plaintiff has been injured in its business and
17   property as it paid more for carbon fiber than it would have paid in the absence of the
18   illegal conduct described in this Complaint.

### PRAYER

20   WHEREFORE, Plaintiff prays for relief as follows:

21   1.   For judgment that the unlawful combination and conspiracy alleged herein
22   is an unreasonable restraint of trade or commerce in violation of the Sherman Act, 15
23   U.S.C. §1;

24   2.   For an award of treble damages and attorneys' fees pursuant to 15 U.S.C. §
25   15a;

26   3.   For interest as provided by law;

27   4.   For costs of suit; and

28   ///

1      5.    For such other and further relief as the Court deems proper.

2

3  DATED:  February 10, 2010    Respectfully submitted,

4                        TOWNSEND AND TOWNSEND AND CREW LLP

5

6                        By:                                                                                                          Richard L. Grossman

7                                  Holly Gaudreau
                                  Jeb B. Oblak

8                        Attorneys for Plaintiff Cytec Engineered
                        Materials Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## JURY TRIAL DEMAND

2

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a jury trial for

3

all issues that may be tried to a jury.

4

5

DATED:  February 10, 2010          Respectfully submitted,

6

TOWNSEND AND TOWNSEND AND CREW LLP

7

8

By:

9

Richard L. Grossman
Holly Gaudreau
Jeb B. Oblak

10

11

Attorneys for Plaintiff Cytec Engineered
Materials Inc.

12

13

14

15

16

17

62443891 v1

18

19

20

21

22

23

24

25

26

27

28

- 42 -

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV10- 163 DOC (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

====================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[X] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY



Name & Address:
Richard L. Grossman / Holly Gaudreau / Jeb B. Oblak
Townsend and Townsend and Crew LLP
Two Embarcadero Center, 8th Floor
San Francisco, CA 94111   Tel: (415) 576-0200

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| CYTEC ENGINEERED MATERIALS INC., <br><br> PLAINTIFF(S) <br><br> v. <br><br> TOHO TENAX CO., LTD., TOHO TENAX AMERICA, INC. and DOES I-X, <br><br> DEFENDANT(S). | CASE NUMBER <br><br> **SACV10-00163** DOC (RNBx) <br><br> **SUMMONS** |
| --- | --- |

TO:    DEFENDANT(S): TOHO TENAX CO., LTD., TOHO TENAX AMERICA, INC. and DOES I-X

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney,  Richard L. Grossman , whose address is Townsend and Townsend and Crew, 2 Embarcadero Ctr, 8th Flr, San Francisco, CA 94111 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:    FEB 1 0 2010                     By: _____

**CHRISTOPHER POWERS**

Deputy Clerk

**SEAL**

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                          **SUMMONS**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br>CYTEC ENGINEERED MATERIALS INC. | **DEFENDANTS**<br>TOHO TENAX CO., LTD., TOHO TENAX AMERICA, INC. and DOES I-X |
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing<br>yourself, provide same.)<br>Richard L. Grossman / Holly Gaudreau / Jeb B. Oblak    Tel: (415) 576-0200<br>Townsend and Townsend and Crew LLP<br>Two Embarcadero Center, 8th Floor, San Francisco, CA 94111 | Attorneys (If Known)<br>Michael R. Lazerwitz                              Tel: (202) 974-1500<br>Cleary Gottlieb Steen & Hamilton LLP<br>2000 Pennsylvania Avenue, NW<br>Washington, DC 20006 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No    ☑ **MONEY DEMANDED IN COMPLAINT:** $ Unspecified amount

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Sherman Act (15 U.S.C. §1)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☑ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco- mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**SACV10-00163**

**FOR OFFICE USE ONLY:**    Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:**  Have any cases been previously filed in this court that are related to the present case?  ☐ No   ☑Yes
If yes, list case number(s):  Case Nos. CV 09-5334-MRP (RNBx); CV-99-07796-FMC (RNBx); CV 02 8126-FMC (RNBx) and CV 05 03372-FMC (RNBx)

and CV 07-00528-MRP (RNBx)

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☑A.  Arise from the same or closely related transactions, happenings, or events; or
   ☑B.  Call for determination of the same or substantially related or similar questions of law and fact; or
   ☐C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
   ☐D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange (location of facility) | Arizona (principal place of business) |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Toho Tenax Co., Ltd. (principal place of business in Tokyo, Japan) Toho Tenax America, Inc. (headquarters in Rockwood, Tennessee) |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | Throughout the United States |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X.  SIGNATURE OF ATTORNEY (OR PRO PER):**  _[signature]_   Date February 10, 2010

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |